**AMERICAN STERILIZER COMPANY, Appellant in No. 75–1305,**

v.

**SYBRON CORPORATION and Castle Company, a Division of Sybron Corporation, Appellants in No. 75–1306.**

**Nos. 75–1305, 75–1306.**

United States Court of Appeals, Third Circuit.

Argued Sept. 18, 1975.

Decided Nov. 7, 1975.

---

D. C., for American Sterilizer Co.; Thomas R. Boland, Shanley, O'Neil & Baker, Washington, D. C., MacDonald, Illig, Jones & Britton, Erie, Pa., of counsel.

John G. Gent, Erie, Pa., John R. Schovee, Rochester, N. Y., for Sybron Corp. and Castle Co.; Schovee & Boston, P. C., Rochester, N. Y., Quinn, Gent, Busick & Leemhuis, Erie, Pa., of counsel.

GARTH, Circuit Judge.

May a patent licensee challenge the scope and validity of the underlying patent without first terminating its license agreement? The district court answered this question in the negative by holding that the licensee's failure to exercise the termination provision in the agreement prevented an attack upon the underlying patent. We reverse, holding that *Lear, Inc. v. Adkins*, 395 U.S. 653, 89 S.Ct. 1902, 23 L.Ed.2d 610 (1969) controls.

## I. FACTS

Each of the parties to this action manufactures and sells gas sterilization apparatus used in modern hospitals. Defendant Sybron Corporation (Sybron), a New York Corporation, owns the McDonald patent [1] which was issued in 1962 to Castle Company (Castle), a division of Sybron. For many years prior to 1962, plaintiff American Sterilizer Company (Amsco), a Pennsylvania corporation, made and sold gas sterilizers independent of any equipment made by Castle.

In 1962 Amsco was marketing a product known as the Cryotherm Sterilizer. Castle claimed that the Cryotherm Sterilizer infringed upon its McDonald patent. As a result of this dispute, Amsco, on July 22, 1964, entered into a nonexclusive license agreement with Castle under the McDonald patent.

The license agreement required Amsco to pay royalties to Castle for the sale of sterilizers equipped with the McDonald process as defined in the contract. Dur-

John F. Potter, Erie, Pa., Paul T. O'Neil, Raymond N. Baker, Washington,

---

1. United States Patent No. 3,068,064 and Canadian Patent No. 664,895.

ing the existence of the license, Amsco "acknowledge[d] the validity of said patents." In addition, the termination provisions of the agreement provided in paragraph 10 that

> Amsco may terminate this agreement on thirty (30) days notice in writing to Castle and payment in full of the accrued royalty and thereafter Amsco shall stand in the same position as to the said patents covered by this Agreement as though this Agreement had not been made.

Thereafter, Amsco developed a new sterilizer known as the Medallion. Sybron, as Castle's successor, asserted that the Medallion process came within the license agreement and claimed royalties due on its sale. Denying that the Medallion process infringed the McDonald patent or came within the license agreement, Amsco refused to pay any royalties, thereby giving rise to this action.

## II. PROCEDURAL HISTORY

On December 29, 1969 Amsco filed its original complaint against Sybron and Castle in the United States District Court for the Western District of Pennsylvania.[2] Among other relief sought was a judgment declaring the McDonald patent invalid and a judgment that the Medallion process did not infringe the McDonald patent. Thereafter, in order to obtain additional relief, Amsco amended its complaint seeking a declaration that the Medallion process was outside the scope of the 1964 license agreement. The amended complaint, filed on May 25, 1970, accordingly alleged in Count I that the McDonald patent was invalid, in Count II that the McDonald patent did not cover the Medallion process, and in Count III that the Medallion process did not come within the license agreement.[3] At all times, up to and including the present, Amsco has refused

to terminate the license agreement as provided in paragraph 10 of that agreement. (*See* pp. 543–544, *supra*).

On January 7, 1971 the parties, with the court's approval, entered into a stipulation limiting trial, at that time, to the third count of Amsco's amended complaint—that the Medallion sterilizer was not subject to the license agreement. The stipulation provided that

> [t]he sole issue to be tried at this time by the Court is whether the plaintiff's Medalion [sic] Cycle comes within the aforesaid license agreement without prejudice to either party to the raising of other issues following the disposition by the Court of this issue.

Following the stipulation Sybron, without answering the first two counts of Amsco's amended complaint, answered Count III. In its answer Sybron claimed by way of counterclaim that it was entitled to a full accounting for all royalties due on the sale of Medallion sterilizers. Amsco answered the counterclaim by asserting as affirmative defenses the same two claims as appear in the first two counts of its amended complaint, i. e., a challenge to the patent's validity (Count I) and to the patent's scope (Count II).

After a trial to the court, the district court filed its opinion on May 26, 1974 holding that the Medallion process came within the license agreement and directing that judgment be entered against Amsco on Count III of the amended complaint. The court also ordered the entry of a judgment for Sybron on the counterclaim in an amount to be determined after a hearing on damages.

From May, 1974 to January, 1975, Amsco, through various motions, attempted on at least three different occasions to

2. References hereafter to Sybron shall be deemed to include Castle.

3. Amsco asserted jurisdiction as to Counts I and II under 28 U.S.C. § 1338 (patent) and as to Count III under 28 U.S.C. § 1332 (diversity). The facts establishing the parties' citizenship were stipulated in the January 7, 1971 stipulation.

raise the issues of the patent's validity and scope. These attempts were unavailing, as all of Amsco's motions were dismissed by the court's order of January 24, 1975. That order also dismissed all counts of the amended complaint except Count III and granted Sybron a judgment on its counterclaim in the amount of $560,508, consisting of the principal sum of $469,409 for royalties due and interest to January 23, 1975.[4]

Amsco appeals from the entire judgment of January 24, 1975. Sybron appeals from so much of the judgment as pertains to damages, claiming that the court erred in its calculations. Our jurisdiction is predicated upon 28 U.S.C. § 1291.

### III. APPLICABILITY OF THE LEAR DOCTRINE

The district court prevented Amsco from challenging the validity and scope of the McDonald patent. It achieved this result by dismissing all counts of the amended complaint except for Count III and by dismissing Amsco's motions which sought to raise validity and scope as essential issues.

The district court explained in its January 23, 1975 opinion:

At the last hearing held today, January 23, 1975, the Court inquired of plaintiff's counsel as to whether it has terminated the license agreement. Plaintiff's counsel was informed that, if it had terminated the license agreement, then the motion to amend the Amended Complaint, filed October 23, last, would be granted, and we would proceed to try validity. Nevertheless, plaintiff's counsel persists in the contention that under the facts of this case plaintiff is entitled to try validity even though it has not repudiated the license. It is the view of this Court that plaintiff's position is untenable. The legal principle enforced for many years that a license [sic] cannot challenge the validity of the patent under which he holds his license has application in this case and is the reason for the dismissal of all counts in the Amended Complaint except Count III.

The court's reliance upon the doctrine of licensee estoppel—that a patent licensee cannot challenge the underlying patent during the term of the license—would require, if we agreed with the district court, a holding that *Lear, Inc. v. Adkins*, 395 U.S. 653, 89 S.Ct. 1902, 23 L.Ed.2d 610 (1969) does not rule the instant litigation.

In *Lear, Inc. v. Adkins, supra,* the Supreme Court granted review of a state court judgment to consider whether a patent licensee could allege patent invalidity as a defense to the licensor's suit for royalties. The state court had held, under the doctrine of licensee estoppel, that the licensee was estopped from attacking the patent during the term of the license. *Adkins v. Lear, Inc.,* 67 Cal.2d 882, 64 Cal.Rptr. 545, 435 P.2d 321 (1968) (in banc). The Supreme Court issued a writ of *certiorari* in *Lear* to resolve the conflict between the state doctrine of estoppel and the federal policy of "free competition in ideas which do not merit patent protection." *Lear, Inc. v. Adkins, supra* 395 U.S. at 656, 89 S.Ct. at 1904.

As a matter of federal patent policy, the Court in *Lear* overruled its prior adherence to the rule that a licensee "may not challenge the validity of the licensed patent in a suit for royalties due under the contract." *Automatic Radio Manufacturing Co. v. Hazeltine Research, Inc.,* 339 U.S. 827, 836, 70 S.Ct. 894, 899, 94 L.Ed. 1312 (1950). In reaching this decision the Court stated:

Surely the equities of the licensor do not weigh very heavily when they are balanced against the important public interest in permitting full and free

---

**4.** Although the January 24, 1975 order recites that interest to January 23, 1975 has been included in the award of $560,508, the parties and the court recognized that interest had been computed only to September 30, 1974. In the event that Sybron prevails on remand, royalties, if any, and interest should be calculated to the appropriate date.

competition in the use of ideas which are in reality a part of the public domain. Licensees may often be the only individuals with enough economic incentive to challenge the patentability of an inventor's discovery. If they are muzzled, the public may continually be required to pay tribute to would-be monopolists without need or justification. We think it plain that the technical requirements of contract doctrine must give way before the demands of the public interest in the typical situation involving the negotiation of a license after a patent has issued.

*Lear, Inc. v. Adkins, supra* 395 U.S. at 670–671, 89 S.Ct. at 1911. Thus the Court held that the paramount federal policy of allowing "full and free competition in the use of ideas which are in reality a part of the public domain" required rejection of the doctrine of licensee estoppel where the license agreement followed the issuance of the patent.

■ The instant controversy represents the "most typical situation" analyzed by the Supreme Court in *Lear*. Here, Amsco obtained its license after the McDonald patent issued.[5] At the time this dispute arose Amsco had not terminated the license agreement. Although the licensor, Sybron, did not sue the licensee, Amsco, as was the case in *Lear*, we find no significance in this procedural difference.[6] Amsco in the course of this litigation has consistently alleged that the McDonald patent is invalid and that therefore the McDonald process is part of the public domain of ideas. Under this circumstance, the "technical requirements of contract doctrine must give way before the demands of the public interest"[7] in testing the validity of the monopoly granted by the federal patent laws.

We cannot agree with Sybron's attempts to distinguish this case from *Lear*. Sybron contends that Amsco's right to terminate the licensee under paragraph 10 of the License Agreement ensures that Amsco cannot be "muzzled." In *Lear* the Court reasoned that a licensee may be the only one with sufficient interest to challenge the inventor's discovery. If the doctrine of licensee estoppel prevented the licensee's challenge, i. e., muzzled the licensee, the public might suffer by paying "tribute to would-be monopolists without . . . justification." *Lear, Inc. v. Adkins, supra* at 670, 89 S.Ct. at 1911. However, Sybron argues that the policy considerations in *Lear* for rejecting licensee estoppel are not applicable here. It bases this argument on an assumption that the licensee in *Lear* was *unable* to terminate its license. We find that assumption to be erroneous.

Although the United States Supreme Court did not discuss the provisions of the *Lear* license agreement, the state court opinion did. The Lear-Adkins license contained two clauses permitting termination of the license by Lear. Furthermore, the state court expressly found that Lear had failed to terminate the license in accordance with the applicable terms. *Adkins v. Lear, Inc.*, 64 Cal.Rptr. 545, 435 P.2d at 325. Thus, the facts of *Lear, Inc. v. Adkins, supra*, are identical to the facts here. Both agreements permitted termination, and both licensees failed to comply with the termination provisions. Thus, the Supreme Court's reference to "muzzling" in *Lear* does not depend upon the presence or absence of a license termination clause.

Sybron alternatively argues that it would be inequitable to follow the *Lear* decision here. We read the Supreme

---

5. In *Lear*, in contrast to the typical situation analyzed, the license agreement was executed before the patent issued. Although the Supreme Court found this a more complex estoppel problem, it concluded, as it had with respect to the most typical situation, that overriding federal policy required a rejection of the license estoppel doctrine in both situations.

6. The Sixth Circuit similarly concluded, as is the case here, that a declaratory judgment action by a licensee against the licensor was "the type of suit authorized by *Lear v. Adkins*." *Atlas Chemical Industries, Inc. v. Moraine Products*, 509 F.2d 1, 5 (6th Cir. 1974).

7. *Lear, Inc. v. Adkins*, supra at 671, 89 S.Ct. at 1911.

Court's opinion in *Lear* as resolving the competing equities between the licensee and the licensor in favor of the licensee. *See* 545–546 *supra.* We, therefore, decline Sybron's invitation to strike a balance which would result in an outcome different from that reached by the Supreme Court in *Lear.*

Nor do we find merit in Sybron's arguments that Amsco waived its patent invalidity and scope contentions in the district court and, therefore, may not pursue them here. Sybron points to the Supreme Court's decision in *Standard Industries, Inc. v. Tigrett Industries, Inc.,* 397 U.S. 586, 90 S.Ct. 1310, 25 L.Ed.2d 590 (1970), in support of this argument. In *Standard Industries,* an equally divided court affirmed the award of royalties in a suit by the patent licensor against the licensee. The licensee had not attempted to attack the validity of the patent, and, under the then prevailing doctrine of licensee estoppel, could not have succeeded in such an attempt. On appeal to the Supreme Court, the licensee sought to attack the validity of the patent based on *Lear, Inc. v. Adkins, supra.*[8] Justice Black, in a dissenting opinion, intimated that four members of the Court considered the licensee's failure to raise an attack on the patent below a waiver of that defense. We cannot know from this summary affirmance in *Standard Industries* why the Court divided on the applicability of *Lear.* However, in relying on the action of an equally divided court, which has little if any precedential value, Sybron is seeking support from a case with facts clearly distinguishable from those present here.

Like the licensee in *Lear* but unlike the licensee in *Standard Industries,* Amsco raised the issues of the validity and scope of the McDonald patent from the commencement of its action. To this date it has neither withdrawn nor receded from its position. Amsco's amended complaint, its affirmative defenses to Sybron's counterclaim, and its various motions preclude any finding of waiver.

We, therefore, hold that the district court erred in denying trial of the patent validity and patent scope[9] issues.[10]

## IV. DAMAGES ON THE COUNTERCLAIM

Our determination that this case is controlled by *Lear, Inc. v. Adkins, supra,* requires that we vacate so much of the district court's order as awarded royalties to Sybron on its counterclaim. In *Lear* the Court considered whether the licensee would be liable for unpaid royalties prior to the adjudication of the invalidity of the patent. The Supreme Court reasoned as follows:

> The decisive question is whether overriding federal policies would be significantly frustrated if licensees could be required to continue to pay royalties during the time they are challenging patent validity in the courts.
>
> It seems to us that such a requirement would be inconsistent with the aims of federal patent policy.

*Id.* 395 U.S. at 673, 89 S.Ct. at 1912. Thus, in *Lear,* where the licensor Adkins

---

**8.** Lear had been decided on June 16, 1969, after the Court of Appeals decision in *Standard Industries. Tigrett Industries, Inc. v. Standard Industries, Inc.,* 411 F.2d 1218 (6th Cir. 1969). The United States Supreme Court decision in *Standard Industries* was rendered on April 20, 1970, which was after *Lear.*

**9.** A claim that a patent is overbroad in terms of the prior state of the art, like a claim of patent invalidity, seeks to achieve the "full and free competition in the use of ideas which are in reality a part of the public domain." *Lear, Inc. v. Adkins, supra* 395 U.S. at 670, 89 S.Ct. 1902. Long before *Lear,* the Supreme Court

had abandoned the rule that the assignor of a patent is estopped to introduce evidence as to the state of the art in order to narrow the scope of a patent when sued by the assignee. *See Westinghouse Electric & Mfg. Co. v. Formica Insulation Co.,* 266 U.S. 342, 350–51, 45 S.Ct. 117, 69 L.Ed. 316 (1924). In the context of this case, there is no reason to separate the trial of the scope of the McDonald patent from the issue of its validity.

**10.** We do not reach Amsco's due process claims in light of our disposition based on *Lear, Inc. v. Adkins, supra.*

brought suit against the licensee immediately after the patent issued, the Supreme Court held that the licensee could "avoid the payment of all royalties accruing" [11] if it could prove that the patent was invalid. *Id.* at 674, 89 S.Ct. at 1913; *see Painton & Company v. Bourns, Inc.,* 442 F.2d 216, 226 (2d Cir. 1971).

Sybron contends that even if the McDonald patent is found invalid, Amsco nevertheless remains liable for the royalties and interest (as corrected, see note 4 *supra*) awarded by the district court's order of January 24, 1975. Essentially, Sybron asserts that a patent licensee is responsible for the payment of royalties until either the license is terminated or the patent is declared invalid. As authority for this argument Sybron cites the Sixth Circuit's two decisions in *Troxel Manufacturing Co. v. Schwinn Bicycle Co.,* 465 F.2d 1253 (6th Cir. 1972), 489 F.2d 968 (6th Cir. 1973), *cert. denied,* 416 U.S. 939, 94 S.Ct. 1942, 40 L.Ed.2d 290 (1974). However, the *Troxel* case, as the Sixth Circuit recognized,

> . . . did not involve an action by a licensee attacking the validity of a patent owned by the licensor. It was *not* the type of suit authorized by *Lear v. Adkins* . . . .

*Atlas Chemical Industries, Inc. v. Moraine Products, supra* at 5. Rather, *Troxel* concerned the liability of a licensee for royalty payments where the licensee did not contest the validity of the patent. In *Troxel* a third party, a stranger to the license agreement, challenged the patent's validity. The Sixth Circuit held in that circumstance the licensee could not avoid royalty payments until such time as the patent was declared invalid. *Troxel Manufacturing Co. v. Schwinn Bicycle Co.,* 489 F.2d at 973. However, where as here the licensee has attacked the patent and has therefore brought "the type of suit au-

thorized by *Lear v. Adkins,*" *Atlas Chemical Industries v. Moraine Products, supra* at 5, the Sixth Circuit held that proof of invalidity would free the licensee from liability for all royalties accruing during the course of litigation. Contrary to Sybron's argument, the Sixth Circuit has reached a result identical to ours in a case presenting identical facts.

While intimating no view as to the merits of the patent issues, we recognize that on remand it may be determined that the McDonald patent is valid and not overbroad. If such be the case, Amsco would be liable to Sybron under Sybron's counterclaim and the district court will again have for consideration the calculation of royalties and interest. At such time a damage issue now presented by Sybron's cross-appeal (from the January 24, 1975 order) will again become relevant. Foreseeing this possibility, we consider it appropriate to consider that issue for the district court's guidance.

Sybron argues here that Amsco's accounting methods have made it impossible for it, Sybron, to prove through an independent audit the amount of royalties owing on the sale of sterilizers equipped with the Medallion process. The district court accepted Amsco's calculation as to the royalties owed and it is that figure which is reflected in the district court's order of January 24, 1975.

In *Westinghouse Electric & Mfg. Co. v. Wagner Electric & Mfg. Co.,* 225 U.S. 604, 618–19, 32 S.Ct. 691, 696, 56 L.Ed. 1222 (1912), the Supreme Court held in a patent infringement action that where the profits of the infringer attributable to infringement and noninfringement cannot be separated, "the law places the loss on the wrongdoer." This same result follows where the infringer fails to keep proper records. *Gotham Silk Hosiery Co. v. Artcraft Silk Hosiery Mills, Inc.,* 147 F.2d 209, 214–15 (3d Cir.

---

11. We need not decide at this time the extent to which a holding that the McDonald patent is invalid, if such be the case, frees the licensee Amsco from accrued royalties. In any

case, royalties cannot be assessed against Amsco until its claims as to the validity and scope of the McDonald patent are resolved.

1945). The burden of proof in such a case is shifted to the infringer or poor record keeper. *See also Calhoun v. United States,* 453 F.2d 1385, 1390, 197 Ct.Cl. 41 (1972). Logic dictates that the principles [12] held applicable to patent infringement cases should similarly be held to apply to situations involving patent license agreements. It will be for the district court to determine on remand whether and to what extent these principles are appropriate and should be applied in the consideration of the damage issues.

Furthermore, should the district court find Amsco liable on the counterclaim, it should determine what, if any, principal and interest should be assessed and from what point in time.

In as much as we cannot forecast the course of the proceedings on remand, we thus cannot predict whether the several damage issues now presented by Sybron on this appeal will again be raised. Nor can we determine at this time, if these issues do surface again, in what form they will be presented and on what record they will be based. Accordingly, we choose not to discuss or pass upon the other damage issues presented by the cross-appeal leaving their resolution, if they arise, to the district court on remand.

## V. CONCLUSION

Having held that the district court erred in its reading and application of *Lear, Inc. v. Adkins, supra,* we are obliged to reverse in its entirety the January 24, 1975 judgment, which among other things, denied Amsco a trial on the validity and scope of the McDonald patent,[13] and which granted damages in the amount of $560,508 to Sybron on its counterclaim.[14] We will therefore reverse the January 24, 1975 judgment and remand for trial of the validity and scope of the McDonald patent and for such further proceedings as may be required consistent with this opinion.

Each party is to bear its own costs.

---

**12.** The Supreme Court in *Westinghouse Electric & Mfg. Co., supra* 225 U.S. at 618–19, 32 S.Ct. at 696 stated:

> Having . . . proved . . . the existence of profits, the plaintiff had carried the burden imposed by law, and established every element necessary to entitle it to a decree, except one. As to that, the act of the defendant had made it not merely difficult but impossible to carry the burden of apportionment. . . . [T]he plaintiff had now presented proof to demonstrate its right to the whole of the fund because of the fact that the defendant had inextricably commingled and confused the parts composing it. . . . It presented a case where the court was called on to determine the liability of a trustee *ex maleficio,* who had confused his own gains with those which belonged to the plaintiff. One party or the other must suffer. The inseparable profit must be given to the patentee or infringer. The loss had to fall on the innocent or the guilty. In such an alternative the law places the loss on the wrongdoer.

**13.** Sybron has argued in its brief and at oral argument that our decision in *Thiokol Chemical Corp. v. Burlington Industries, Inc.,* 448 F.2d 1328 (3d Cir. 1971), *cert. denied,* 404 U.S. 1019, 92 S.Ct. 684, 30 L.Ed.2d 668 (1972), bars the district court's consideration of Counts I and II of the amended complaint. In *Thiokol* we held that the district court lacked jurisdiction under 28 U.S.C. § 1338(a) in a declaratory judgment action by a licensee to invalidate a patent. In that case where diversity jurisdiction was not asserted and did not appear to be present, we noted that 28 U.S.C. § 1338(a) was "[t]he only basis of jurisdiction pleaded. . . ." *Id.* at 1330.

Although we express no opinion as to jurisdiction on remand, we recognize that here Amsco not only asserts § 1338(a) jurisdiction but also predicates jurisdiction on the parties' diversity of citizenship, 28 U.S.C. § 1332, an aspect not present in *Thiokol. See* note 3 *supra.*

**14.** Nothing which we have discussed in this opinion is intended to preclude the district court from finding the principal amount of royalties in the same amount it originally determined in its order of January 24, 1975, if the record on remand, developed consistent with this opinion, leads to that conclusion.