AMERICAN STERILIZER COMPANY,
Appellant in No. 79–1445,

v.

SYBRON CORPORATION and Castle
Company, A Division of Sybron Corpo-
ration, Appellants in No. 79–1446.

Nos. 79–1445, 79–1446.

United States Court of Appeals,
Third Circuit.

Argued Oct. 10, 1979.

Decided Feb. 4, 1980.

John F. Potter, Erie, Pa., Paul T. O'Neil,
(argued) Raymond N. Baker, Washington,
D. C., for American Sterilizer Co.; Shanley,
O'Neil & Baker, Washington, D. C., MacDo-
nald, Illig, Jones & Britton, Erie, Pa., of
counsel.

John G. Gent, Erie, Pa., John R. Schovee,
(argued) Rochester, N. Y., for Sybron Corp.
and Castle Co.; Schovee & Boston, P. C.,
Rochester, N. Y., Quinn, Gent, Buseck &
Leemhuis, Inc., Erie, Pa., of counsel.

Before ADAMS, ROSENN and WEIS,
Circuit Judges.

OPINION OF THE COURT

ROSENN, Circuit Judge.

In the century that has elapsed since Jo-
seph Lister revolutionized the medical field
by his advocacy of antiseptic surgical proce-
dures, the medical profession has come to
rely upon the use of sterilized instruments
and materials as an indispensable ingredi-
ent of proper health care. In this patent
appeal, we are asked to assess the validity
of a sterilization process known as the "Mc-
Donald patent" issued to Castle Company
(Castle), a division of Sybron Corporation
(Sybron), and whether American Sterilizer
Company (Amsco), a competitor, owed any
royalties to Sybron under a licensing agree-
ment for sales of an alleged infringing ster-
ilizer.

The present controversy originated over a
decade ago when Amsco filed a declaratory
judgment action in the United States Dis-
trict Court for the Western District of
Pennsylvania seeking to determine the va-

lidity and scope of the McDonald patent as well as a declaration as to whether its own "Medallion sterilizer" came within the definition of "Infringing Method" in the licensing agreement. The district court held that the McDonald patent was invalid, but relying on the decision of the United States Supreme Court in *Lear, Inc. v. Adkins*, 395 U.S. 653, 89 S.Ct. 1902, 23 L.Ed.2d 610 (1969), it found that Amsco was liable for damages for breach of the licensing agreement up to the time it instituted this action. The court fixed damages in the amount of $112,206 plus interest. Amsco appeals from the district court's award of royalties to Sybron and Sybron cross-appeals from the court's invalidation of the McDonald patent. We affirm.

## I.

This controversy, like most patent cases, wends its way through a complex network of facts. Sterilization in the context of this case may be roughly defined as a method of killing harmful or unwanted microorganisms through the use of a gas having biocidal properties. Originally, formaldehyde was used as a sterilizing agent, but after a number of years, ethylene oxide was discovered to possess far superior sterilization properties. In 1956, Robert McDonald was engaged by the Castle Company to develop an ethylene oxide sterilizer. McDonald developed a sterilizer which operates in the following manner:

(1) The goods to be sterilized are placed in a sealed chamber.

(2) A vacuum pump evacuates the air in the chamber to a selected level at which time the pump is turned off.

(3) A measured quantity of water is introduced into the evacuated chamber to humidify the goods to a selected level while the pump is off.

(4) The selected humidity level is maintained for a "dwell period"[1] in order to moisten the goods.

(5) After the goods are moistened, ethylene oxide is introduced as the sterilizing agent.

Each of the steps in the method is a discrete segment of the process and the McDonald process is known as a "step-by-step" process.

McDonald filed a patent application for his process and sterilizer on December 6, 1957, which was granted by the United States Patent Office on December 11, 1962.[2] Sybron Corporation, as Castle's parent, became the owner of the McDonald patent.

When the McDonald patent was first issued, Amsco was selling a Cryotherm sterilizer operating in principle similar to the McDonald patent. In order to avoid an infringement lawsuit, Amsco and Sybron entered into a licensing agreement on July 22, 1964, by which Amsco agreed to and did pay royalties to Sybron on the Cryotherm sterilizers. Amsco, however, subsequently developed another ethylene oxide sterilizer which it called the Medallion sterilizer. The Medallion sterilizer operates in the following manner:

(1) The chamber is evacuated to a specified level by a vacuum pump which continues to operate.

(2) While the pump is operating, steam is introduced into the chamber to heat and moisten the goods.

(3) At a selected temperature the pump is terminated and the ethylene oxide is introduced.

Because the vacuum pump operates continuously, the Medallion sterilizer embodies what may be termed a "continuous flow process."

The Medallion sterilizer is the subject of the present proceedings. The companies could not agree on whether this sterilizer came within the definition of "Infringing Method" under the licensing agreement of

---

1. A "dwell period" may be defined as an ideal period of time for the diffusion of moisture in the evacuated chamber at a preselected humidity level into the article to be sterilized.

2. United States Patent No. 3,068,064 and Canadian Patent No. 664,895. McDonald abandoned any patent claim to the apparatus and consequently the patent covers only the sterilization process itself.

July 22, 1964, covering the McDonald patent.[3] Amsco brought a declaratory judgment action on December 29, 1969, to determine the validity of the McDonald patent and its liabilities, if any, under the licensing agreement. An amended action was filed on May 25, 1970, in which Amsco principally charged that (1) the McDonald patent was invalid; (2) the Medallion sterilizer was not covered by the claims of the McDonald patent when such claims were interpreted in light of prior art; and (3) the Medallion sterilizer was not within the definition of infringing method in the licensing agreement. The parties by stipulation agreed only to try the last issue of the scope of the infringing method definition.

Following the stipulation, Sybron answered only Count III of Amsco's complaint dealing with the definition of infringing method. Sybron counterclaimed against Amsco under this count for all royalties owed for sales of the alleged infringing Medallion sterilizers. Amsco replied to the counterclaim by interposing as affirmative defenses its original contentions that the McDonald patent was invalid (Count I), and that the Medallion sterilizer did not come within its claims when narrowed by prior art (Count II). The district court in a bench trial found for Sybron on its counterclaim and assessed $560,508 representing royalties plus interest due on the sale of Medallion sterilizers. The court denied, on the ground that a licensee is estopped from challenging a patent's validity during the duration of the license, subsequent motions by Amsco raising the patent's validity and scope as defenses.

We reversed in an opinion written for this court by Judge Garth, *American Sterilizer Co. v. Sybron Corp.*, 526 F.2d 542 (3d Cir. 1975), holding that under the United States Supreme Court's decision in *Lear,*

*Inc. v. Adkins, supra,* the doctrine of licensee estoppel no longer prevented the licensee from challenging the patent's validity during the life of the licensing agreement. The case was remanded to the district court for a determination of the validity and scope of the McDonald patent.

The district court, after a second bench trial, declared the McDonald patent invalid under: (1) 35 U.S.C. § 101 (1976) for lack of patentable subject matter; (2) 35 U.S.C. § 102(b) (1976) as being "on sale" more than one year prior to the filing date of the patent; and (3) 35 U.S.C. § 103 (1976) as obvious in light of prior art. The district court also held that Amsco had breached its licensing agreement with Sybron by marketing the Medallion sterilizer and in accordance with principles announced in *Lear, supra,* assessed $112,206 plus interest in royalties against Amsco for sales up to the initiation of the lawsuit.

We believe the district court was correct in invalidating the patent as obvious in light of prior art under 35 U.S.C. § 103, and under *Lear,* we conclude Amsco owed royalties to Sybron on sales of Medallion sterilizers. For purposes of clarity we will first examine the patent validity issue raised by Sybron's cross-appeal and then we will determine whether Amsco had any royalty obligation to Sybron.

## II.

The district court held the McDonald patent to be invalid under 35 U.S.C. § 103 which provides:

A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvi-

---

3. The licensing agreement defined "Infringing Method" as:

[A] method which sequentially includes the steps of:

(1) Evacuation of the chamber to a selected level;

(2) Introducing water vapor *during and/or after evacuation* to humidify the chamber to

a selected level *established during or after evacuation.*

(3) Maintaining substantially said selected humidity level for a *dwell period* to permit diffusion of moisture into the article being sterilized. (Original emphasis.)

ous at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made.

Section 103 is designed to exclude from patentability discoveries that do not meet a certain minimal level of inventiveness. The Supreme Court has stated: "Unless more ingenuity and skill . . . were required . . . than were possessed by an ordinary mechanic acquainted with the business, there was an absence of that degree of skill and ingenuity which constitute essential elements of every invention. In other words, the improvement is the work of the skilled mechanic, not that of the inventor." *Hotchkiss v. Greenwood*, 52 U.S. (11 How.) 248, 267, 13 L.Ed. 683, 691 (1851).

■ Because inventiveness is such an elusive concept, courts have attempted to set up criteria by which a particular claimed invention may be measured to see if the patent is obvious or nonobvious. Obviousness under section 103 is determined through three related inquiries: (1) scope and content of prior art; (2) differences between prior art and the claimed invention; and (3) the level of ordinary skill in the art. *Graham v. John Deere Co.*, 383 U.S. 1, 17, 86 S.Ct. 684, 693, 15 L.Ed.2d 545 (1966); *Sims v. Mack Truck Corp.*, 608 F.2d 87, 90 (3d Cir. 1979); *Paeco, Inc. v. Applied Moldings, Inc.*, 562 F.2d 870, 877 (3d Cir. 1977). The Supreme Court has indicated that "[s]uch secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented." *Graham, supra*, 383 U.S. at 17–18, 86 S.Ct. at 694. We have held, however, that these secondary factors "cannot, by themselves support a finding of nonobviousness if it is otherwise established that a patent's disclosures are obvious in light of the prior art." *Tokyo Shibaura Electric Co. v. Zenith Radio Corp.*, 548 F.2d 88, 94–95 (3d Cir. 1977); *Sims, supra*, 608 F.2d at 90. Thus, to assess the validity of the McDonald patent under 35 U.S.C. § 103,

we must examine: (1) existing sterilization processes and principles at the time of McDonald's invention; (2) the claimed differences between the McDonald process and prior sterilization art; and (3) the level of ordinary skill in the art of inventing sterilizing processes.

## A. *Scope and Content of Prior Art*

■ The earliest known patented gas sterilization process was developed in Britain around the turn of the twentieth century and utilized formaldehyde as the sterilization agent. This process, known as the "British Defries Patent" (Defries), operated by continuously passing steam through a chamber, and moistening the goods to be sterilized to a 100% humidity level to enable the formaldehyde to kill effectively any unwanted microorganisms. Formaldehyde, however,. proved to be less than an ideal sterilization agent particularly because it did not penetrate completely certain kinds of material and left a distasteful odor on the sterilized article. Further, to operate efficiently formaldehyde required a high moisture content in the article to be sterilized.

Some years later, ethylene oxide was discovered to be another effective sterilization agent. In the late 1930's, two patents, one British and one American were awarded for sterilization processes using ethylene oxide. The British Wiles-Merriam patent discussed the *Defries continuous flow process* but without limiting it to the use of formaldehyde as the sterilization agent. This patent also disclosed a method for heating the walls of the sterilization chamber to pass steam through it. The British Wiles-Merriam patent corresponds to a similar American process, the U.S. Merriam and Wiles patent.

By 1954, it was known that ethylene oxide was a far superior sterilization agent to formaldehyde. The use of ethylene oxide is less expensive than formaldehyde; goods may be sterilized at a lower temperature; all traces of ethylene oxide may be easily removed from the sterilized article; and

ethylene oxide has the capability of penetrating materials resistant to formaldehyde. These findings were summarized in a publication by C. R. Phillips, "Gaseous Sterilization," *reprinted in 6.* Reddish, *Antiseptics, Disinfectants, Fungicides, and Chemical & Physical Sterilization,* 638–54 (1954).

Further, it was known that ethylene oxide operated effectively at lower levels of moisture content in the article to be sterilized. A publication by John J. Perkins, *Principles and Methods of Sterilization,* Chapter XXI, at 325–34 (1956) taught that ethylene oxide requires the goods to be moistened prior to sterilization, ideally with the moisture content to be in equilibrium with 30–60% relative humidity. One of the chief problems encountered with the use of ethylene oxide was excess "wetting" of the goods. Although it was known that ethylene oxide was only maximally effective at lower levels of moisture content, existing ethylene oxide sterilizers were unable to prevent excess moisture from remaining in the goods to be sterilized. Perkins developed an ethylene oxide sterilizer but it did not provide for the measured introduction of water vapor into the sterilization chamber.

### B. *Differences Between McDonald and Prior Art*

In 1956, Castle Company hired Robert McDonald to develop an ethylene oxide sterilizer. McDonald was not trained in this particular field and consequently undertook to familiarize himself with the existing art. He subsequently found a solution to the problem of maintaining the proper relative humidity for the maximization of ethylene oxide's biocidal properties. McDonald's process, in essence, embodied a "dwell period" at a preselected humidity level in which moisture could diffuse into the article to assure the optimum efficiency for ethylene oxide. The selected humidity level was achieved by attaching a bottle containing a measured quantity of water to the sterilizer. The water would then vaporize when heat was applied and moisten the article inside the chamber to the proper relative humidity. The sequential opera-

tion of the vacuum pump in McDonald's sterilizer maintained the selected humidity level for a specific period of time, thereby allowing the moisture to diffuse into the article to be sterilized at a designated relative humidity before the ethylene oxide was introduced into the sterilization chamber.

The claimed difference between McDonald's process and prior art is precisely the "dwell period" at a selected humidity level. No prior process had been able to regulate with such precision the moisture content within the sterilization chamber. The key question then is whether McDonald's contribution to the ethylene oxide gas sterilizer industry was the product of true "inventiveness" or whether it was simply the work of a skilled mechanic operating with existing technology.

### C. *Ordinary Level of Skill*

The third and crucial inquiry under section 103 is whether given the prior art, a person of ordinary skill in the art would have discovered the claimed invention. If the leap between the prior art and the asserted differences in the claimed discovery is not the product of true "inventiveness," the patent must be declared invalid for obviousness.

From our review of the existing art, we note initially that the problem of excess moisture in ethylene oxide sterilizers was well-known at the time of McDonald's invention. Indeed, Sybron's expert admitted that this problem was obvious from existing literature but asserted that its solution was not discernible. McDonald's answer to the excess moisture problem was to attach a bottle containing a measured amount of water which would vaporize when heated by a coil, thereby humidifying the goods inside the sterilizing chamber to a selected humidity level. The humidity level was in turn maintained for a "dwell period" to permit proper diffusion throughout the item to be sterilized. This essentially is the invention before us.

McDonald abandoned any patentable claim to the sterilizing apparatus itself. Therefore, the unique feature of his device, the attached water bottle, is in the public

domain. If anything is patentable, it is the *idea* of introducing a measured quantity of water vapor into the sterilization chamber, which then is permitted to diffuse into the article during a "dwell period." The district court's findings reveal that at the time McDonald invented his process it was known: (1) from the Defries patent that articles to be sterilized should be humidified inside a chamber; (2) from Perkins, that ethylene oxide operated effectively at only 30–60% relative humidity; and (3) from thermodynamic principles that the relative humidity level in the chamber may be decreased to less than 100% humidity by heating the walls of the chamber. We believe from this existing knowledge, it would have been obvious to a person of ordinary skill in the art that the way to solve the excess humidity problem with ethylene oxide was to introduce a measured volume of water vapor by evaporating a selected quantity of water through the application of heat. Further, the maintenance of the humidity level for a "dwell period" to permit proper diffusion was a logical corollary of the known requirement of using less than 100% humidity.[4] With formaldehyde, however, the articles to be sterilized became immediately saturated with water vapor once steam was introduced into the chamber.

Although McDonald found a solution to the excess moisture (wetting) problem, which had eluded others and which proved to be a great commercial success, these secondary considerations can not obscure the obviousness of McDonald's discovery in light of prior art. Our conclusion is underscored by the manner in which McDonald made his discovery. McDonald had no prior training in the development of ethylene oxide sterilizers. After he was hired by Castle Company, McDonald read and familiarized himself with the existing art. He then proceeded to experiment with techniques for introducing lower levels of water vapor into the sterilization chamber with the resultant discovery of the water bottle system. We believe this process reveals that McDonald's discovery could have been made by anyone with ordinary skill in the subject art simply through variations in the mechanical combination of the existing art. We therefore see no error in the district court's invalidation of the McDonald patent as obvious under section 103.[5]

## III.

The district court, although declaring the McDonald patent invalid, nevertheless awarded Sybron $112,206 on its counterclaim against Amsco for royalties under the licensing agreement allegedly due on sales of Medallion sterilizers up until the filing of the present action. The district court held that the Supreme Court's decision in *Lear, supra,* permitted such a royalty award even though the patent was declared invalid.

The parties expend considerable energy contesting whether under *Lear,* Amsco had any royalty obligation on the Medallion sterilizers because it allegedly fell within the scope of the McDonald patent's claims. This dispute, however, blends two analytically distinct issues. Amsco conceivably owed Sybron royalties because the Medallion sterilizer was (1) within the scope of the McDonald patent's claims, or (2) within the definition of "Infringing Method" under the licensing agreement. The former theory is one of patent infringement; the latter poses simply a breach of contract claim.

The confusion between the parties is generated in part by a misunderstanding of the district court's opinion. At a post-trial hearing, Judge Willson clarified his position by stating that the royalty award was not based on a determination that the Medallion sterilizer was within the scope of the

4. The district court found as a fact that the Defries patent disclosed a process in which steam was brought into and through the sterilizing chamber for a period of time to moisten and heat the goods to be sterilized before the introduction of the sterilizing gas into the chamber.

5. Our holding makes it unnecessary to examine the alternative grounds of invalidity found by the district court under 35 U.S.C. §§ 101, 102(b).

McDonald patent, but rather on his determination that the Medallion was within the definition of "Infringing Method" under the licensing agreement.[6]

Hence, despite the patent's invalidity, Sybron had a contract claim against Amsco enforceable until the initiation of the lawsuit. Amsco has not argued that the Medallion sterilizer was not within the definition of "Infringing Method" in the licensing agreement. We, therefore, must accept the district court's determination that the Medallion sterilizer was within the scope of the licensing agreement.[7]

We must determine, however, the extent of Amsco's royalty obligation under the license. In the first appeal in this case, we indicated that under *Lear*, Amsco's royalty obligations would have been suspended upon filing of the lawsuit if the patent were declared invalid. Amsco claims it owed no royalties up until the filing of the lawsuit because none were ever paid on the Medallion sales and the McDonald patent has now been declared invalid. Writing for the court in the earlier appeal, Judge Garth declined to decide "the extent to which a holding that the McDonald patent is invalid . . . frees the licensee Amsco from accrued royalties." 526 F.2d at 548 n. 11. That is precisely the task before us now.

In *Lear*, the Supreme Court formally repudiated the doctrine of licensee estoppel which prevented licensees from challenging the validity of a patent during the life of the licensing agreement. 395 U.S. at 670–71, 89 S.Ct. 1902. Under *Lear*, a licensee may indeed challenge the validity of the patent which it has licensed and its royalty obligation is suspended "at least from the time he refuses to pay the contractual royalties." *Id.* at 674, 89 S.Ct. at 1913. This freedom from a royalty obligation springs from patent law policy. That policy encourages licensees to litigate the validity of patents, because patents are issued ex parte by the Patent Office.[8] Thus, the effective method for assaying the validity of the patent is for a licensee to challenge it, claiming that he owes no royalties because the patent is invalid. One commentator has observed: "The 'spirit of *Lear*' appears to be one of providing some incentive to licensees to challenge patent validity and to eliminate obstacles to suit by those disposed to challenge the validity of a patent." McCarthy, *"Unmuzzling" the Patent Licensee: Chaos in the Wake of Lear v. Adkins (Part I)* 59 J. Patent Office Society, 475, 476 (1977).

The *Lear* decision, although it discarded the undesirable contractual principle of licensee estoppel, has engendered considerable confusion regarding other contractual issues relating to licensing agreements. The problem has been succinctly stated: "How much of the law of contracts and patents must fall in order to give licensees sufficient encouragement to challenge [the validity of patents]." *Id.*

The classic case which *Lear* envisions is one in which the licensee pays royalties for a period of time under a licensing agreement, then ceases payment and promptly brings a lawsuit challenging the patent's validity.[9] Problems, however, arose with

---

**6.** This result is consistent with the court's holding in the first trial of this case that the Medallion was within the scope of the infringing method definition in the license.

**7.** Amsco contends that the district court was required to decide the scope of the McDonald patent's claims, but failed to do so. Amsco, citing the United States Supreme Court's decision in *Westinghouse Electric & Mfg. Co. v. Formica Insulation Co.*, 266 U.S. 342, 45 S.Ct. 117, 69 L.Ed. 316 (1924), argues that the scope of the patent must be narrowed in light of prior art. The district court, however, held that the patent was invalid and decided the issue of royalties on the basis of the licensing agree-

ment rather than the scope of the patent. We agree and therefore do not decide the issue of the scope of the patent.

**8.** For example, the U.S. Patent Office did not consider the British Defries patent in prosecuting the McDonald patent application and issued the patent only in light of the U.S. Merriam-Wiles patent. Amsco was able to introduce the Defries patent as relevant prior art by challenging the McDonald patent's validity.

**9.** *Lear* itself involved a different set of facts. In *Lear*, the parties entered into a licensing agreement *before* the patent was issued. Upon issuance, the licensee sued to declare the pat-

interpreting what actually constituted a prompt challenge by the licensee to the patent's validity. Although the Supreme Court in *Lear* had stated that a licensee's royalty obligation was suspended when royalty payments were halted, the Sixth Circuit in *PPG Industries, Inc. v. Westwood Chemical, Inc.*, 530 F.2d 700, 706 (6th Cir.), *cert. denied*, 429 U.S. 824, 97 S.Ct. 76, 50 L.Ed.2d 86 (1976), has read *Lear* to permit other cut-off dates for the licensee's royalty obligations under the licensing agreement.

In *PPG Industries, supra*, the court indicated that "[s]omething more than non-payment" of royalties is necessary to insure that the licensee promptly challenges the patent's validity. In *PPG Industries*, the licensee, PPG suspended royalty payments in 1969 under a non-exclusive license with Westwood Chemical, Inc. PPG, however, did not inform Westwood of the reason for its non-payment of royalties. At the time, infringement suits brought by Westwood against various companies were pending, in which the validity of Westwood's patents was also challenged. PPG actively assisted Westwood in bringing these infringement suits. A district court in 1970 found the patents invalid. In 1971, PPG brought a declaratory judgment action against Westwood for breach of the license, and when the district court's invalidation of the patents was affirmed on appeal, amended its complaint to assert the patents' invalidity. PPG thereby sought to collaterally estop Westwood from claiming any royalties under the license from the date PPG suspended royalty payments. Relying on the presence in *Lear* of the "additional affirmative step of notifying the licensor of invalidity," *id.* at 706, the Sixth Circuit held that the date PPG filed its lawsuit in 1971 was the cut-off date under *Lear* for royalty obligations under the licensing agreement. *Id.* at 707.

The result in *PPG Industries* has been praised as consistent with *Lear's* goal of

promoting prompt challenges to the patent's validity:

> If a licensee has a non-frivolous basis for asserting the patent's invalidity and so informs the licensor, and if the licensee stops paying royalties, then the licensee may be freed from royalty payments unless the licensor sues the licensee for royalties and the patent's validity is sustained. However, the declaratory judgment action brought by PPG to assert that the licensor had breached the license agreement offered no opportunity to contest the validity of the patent.

Jennings and Bryan, *The Ever Expansive Scope of Lear v. Adkins: Does It Have Limits?* 59 J. Patent Office Society, 679, 698 (1977). Thus, the key issue is whether a prompt challenge to the patent follows the licensee's suspension of royalty payments.

Amsco argues that its non-payment of royalties for sales of the Medallion sterilizer operated as the requisite suspension of royalties so as to invoke *Lear's* protection. It is not clear from the record when Amsco first began marketing the Medallion, but there is nothing in this record to indicate that Amsco coupled its non-payment of royalties *with notice to Sybron* that the reason for non-payment was Amsco's intent to challenge the validity of the McDonald patent. Rather, the parties apparently entered into negotiations concerning whether the Medallion was within the scope of the definition of infringing method in the licensing agreement. There is no indication that at these negotiations, Amsco informed Sybron that the McDonald patent's validity was in issue. The first clear indication of Amsco's intent to challenge the McDonald patent came with the filing of the present lawsuit in 1969. Thus, to relieve Amsco from royalty obligations prior to the initiation of the lawsuit would not further *Lear's* policy of encouraging licensees to challenge promptly a patent's validity. We, therefore, believe the district court was correct in selecting the date the lawsuit was filed as the date

ent invalid. Thus, the royalty question in *Lear* was whether under California state law, a contractual obligation existed prior to the patent's issuance. The Court remanded the case for a determination of this issue. 395 U.S. at 675, 89 S.Ct. 1902.

from which Amsco's royalty obligation under the licensing agreement ceased.[10]

## IV.

The only remaining issue is the district court's computation of the royalties owed by Amsco. In the first appeal, Sybron argued that Amsco's accounting methods made it impossible for it to determine the amount of royalties owed on Medallion sales. Judge Garth noted that in patent infringement actions, the loss due to an inability to compute damages accurately is placed on the infringer where it has failed to keep adequate records. 526 F.2d at 548–49. Judge Garth indicated that a similar result should obtain in breach of licensing agreement cases and that the district court on remand should consider the problem of Amsco's recordkeeping in determining royalties owed.

Judge Willson awarded Sybron $112,206 plus interest in royalties. The parties stipulated, to avoid an accounting trial, that this sum would be an accurate figure of Medallion sales. Sybron, at a post-trial hearing, however, pressed for a royalty figure of $143,000 on the ground that Amsco did not keep adequate records of infringing and non-infringing methods. The court rejected this argument and entered judgment on the stipulated figure. Sybron argues on appeal that the district court did not adequately consider the problem of Amsco's recordkeeping as this court commanded in the first appeal.

We do not believe the district court erred in entering judgment in the amount stipu-

lated to by the parties. The $112,206 figure represents the sales on Medallion sterilizers and Sybron's acceptance of this figure as accurate makes any consideration of additional damages due to Amsco's allegedly inadequate recordkeeping speculative. We believe the $112,206 figure represents a just damage award to Sybron for breach of the licensing agreement. We accordingly affirm the district court's entry of judgment on Sybron's counterclaim in the amount of $112,206.

## V.

In sum, we hold that the McDonald patent is invalid for obviousness under 35 U.S.C. § 103 and the judgment of the district court in No. 79–1446 will be affirmed. We also hold that Sybron was entitled to $112,206 in damages for breach of the licensing agreement by Amsco up until the filing of this lawsuit in 1969 and accordingly the judgment of the district court in No. 79–1445 will be affirmed.

Costs to be taxed against Amsco in No. 79–1445 and against Sybron in No. 79–1446.

10. Sybron argues that the actual cut-off date should be much later, possibly as late as 1974, because the parties stipulated to try first only the issue of the scope of the infringing method definition in the licensing agreement. Sybron, however, had notice of Amsco's intent to challenge the validity of the McDonald patent in 1969, and we believe should not be permitted to take advantage of a stipulation which it agreed to in the interest of simplifying the litigation between the parties.

Sybron also contends that Amsco's royalty obligation for Medallion sales did not end on the date the lawsuit was filed because only the McDonald patent was challenged and the license agreement was a package license containing other patents, which although royalty free, were not challenged. This argument was not raised in the district court and we accordingly decline to consider it for the first time on appeal. *See Kappel v. United States,* 437 F.2d 1222, 1224 (3d Cir.), *cert. denied,* 404 U.S. 830, 92 S.Ct. 71, 30 L.Ed.2d 59 (1971).